1

2

3

4

5

6

7

8                                    UNITED STATES DISTRICT COURT

9                             FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    KORI MCCOY, et al.,                           No.  2:19–cv–1191–JAM–CKD

12                    Plaintiffs,                     ORDER

13           v.                                       (ECF No. 128)

14    CITY OF VALLEJO, et al.,

15                    Defendants.

16

17          Presently before the court is plaintiffs' motion to compel from defendants nearly all

18    materials created in connection with a Vallejo Police Department ("VPD" or "Department")

19    independent internal investigation into a suspected badge-bending practice within the

20    Department.  (ECF No. 128.)  The parties filed a Joint Statement regarding the discovery

21    disagreement, along with supporting exhibits—which were all provisionally filed under seal at the

22    parties' request.  (ECF Nos. 138-138.14.)  Following supplemental briefing on the request to seal

23    (ECF Nos. 145, 146), the court ordered defendants to re-file on the docket redacted versions of

24    these same documents (ECF Nos. 142-143; see ECF Nos. 144-144.15).[1]  The court heard remote

25    arguments on the motion to compel on December 15, 2021.  (ECF No. 139.)  Following the

26    hearing, the court accepted for in camera review the main badge-bending investigative report and

27    _____

28    [1]      The court cites to the publicly accessible redacted filings and refers only generically to the
      redacted portions thereof.  The order and pagination of both sets of documents is the same.

                                                    1

1    a supplemental report; and the court permitted defendants to also submit proposed redacted

2    versions of the reports, which defendants have done.  (ECF Nos. 140, 141.)

3        After careful review, the court GRANTS IN PART and DENIES IN PART plaintiffs'

4    motion to compel, without prejudice to renewal.  Defendants shall forthwith produce to plaintiffs

5    both the main and supplemental reports with some—but not all—of their proposed redactions.

6    The parties shall further confer as to production of any of the interviews or other exhibits to the

7    report, with the benefit of the general guidance in this order and with plaintiffs having reviewed

8    the contents of the reports, before seeking further judicial intervention as to those items.

9    **BACKGROUND**

10       **A. The Underlying Action**

11       This excessive force case is brought by the surviving siblings of Willie McCoy, a 20-year-

12   old man who in February 2019 was fatally shot by a group of VPD officers as he slept in his car.

13   Plaintiffs are suing six VPD officers involved in the shooting, two VPD supervisors, former VPD

14   Chief Andrew Bidou, and the City of Vallejo for—as relevant to this motion—excessive force,

15   municipal liability, and supervisory liability under 42 U.S.C. § 1983.  Plaintiffs also name as Doe

16   defendants other yet-to-be-identified VPD officers.  (ECF No. 84, Second Amended Complaint

17   ("SAC"), at 5-9, 26-29, 34-35.)

18       To briefly describe the facts as relevant to this discovery dispute, around 10:30 PM on

19   February 9, 2019, VPD officers responded to a citizen's call requesting a welfare check for an

20   unconscious man, slumped over the steering wheel of his car at a Taco Bell drive-thru in Vallejo.

21   (SAC ¶¶ 33-34.)  VPD defendant officers Anthony Romero-Cano, Mark Thompson, Jordan

22   Patzer, Bryan Glick, Collin Eaton, and other Doe officers arrived on scene to find Willie McCoy

23   still unconscious, apparently sleeping, but with a handgun on his lap—although the magazine was

24   removed.  (SAC ¶¶ 5, 34, 36, 43.)  The car's doors were locked, but the passenger-side window

25   was missing and had only a thin piece of plastic covering it.  (SAC ¶ 36.)

26       The officers "stood around the car" and put out a radio dispatch that they might have a

27   potential shooting situation.  (SAC ¶¶ 3, 37, 40.)  The allegedly on-call VPD supervisors,

28   ////

2

defendants Steve Darden and Kyle Wylie,[2] ignored the call and watched Netflix instead of responding over the radio.  (SAC ¶ 38.)  The officers at the scene formulated no plan, except that defendant Romero-Cano told the other officers to shoot McCoy if he moved.  (SAC ¶¶ 3, 39.)  The officers gave McCoy no verbal commands, and when McCoy started to rouse (scratching his shoulder, still with his eyes closed), the officers collectively fired at him while yelling for him to show his hands.  (SAC ¶¶ 3, 41, 44.)  In the middle of officers firing at McCoy, defendant officer Ryan McMahon arrived and joined in the shooting without any knowledge of the circumstances.  (SAC ¶¶ 4, 42.)  The officers fired 55 rounds at McCoy, who died where he sat.  (SAC ¶¶ 5, 43.)

Since this action's filing in June 2019, plaintiffs have included a <u>Monell</u> claim for municipal liability against former Chief Bidou (who retired in June 2019) and the City, alleging a pattern and practice of officers using excessive force without facing disciplinary consequences.  (ECF No. 1 at 21-23, ECF No. 14 at 21-23.)  The original complaint also included a <u>Monell</u> claim against City Manager Greg Nyhoff, but plaintiffs stipulated to dismiss this claim with prejudice, out of acknowledgement that Nyhoff was not "the final decision-maker for the Vallejo Police Department."  (ECF No. 12 at 12 (quoting plaintiffs' opposition to motion to dismiss).)  In support of these claims, plaintiffs listed some 21 other incidents where VPD officers allegedly used excessive force and were not disciplined for it.  The current SAC, filed with defendants' consent in March 2021 after discovery was underway, retains those general pattern-and-practice allegations but—importantly for this motion—adds an additional basis for imposing municipal liability.

According to the SAC, there exists within the VPD a "vigilante police gang" known as the "Badge of Honor" gang, which Chief Bidou "knew about, protected and endorsed."  (SAC ¶¶ 6, 47.)  The SAC attributes these allegations to the contents of a whistleblower lawsuit filed in

---

[2]     The SAC refers to Sergeant Wylie only as "FNU WILEY" or "WILEY."  However, subsequent filings confirm that this defendant's correct name is Kyle Wylie.  (<u>See, e.g.</u>, ECF No. 94 (motion to dismiss, filed on behalf of all defendants, including "KYLE WYLIE"), ECF No. 144 (Joint Statement, same).)

In the context of this discovery disagreement, defendants argue that only Sergeant Wylie—not now-Lieutenant Darden—was the officers' supervisor that night.  (ECF No. 144 (Joint Statement) at 9, 28.)

1  state court last year by former VPD Captain John Whitney.  (Id.; see John Whitney v. The City of

2  Vallejo, et al., No. FCS055842 (Cal. Super. Ct. Solano Cty., complaint filed Dec. 22, 2020).)

3  Plaintiffs allege that the gang rewarded officers for shooting and killing citizens, commemorating

4  each killing by bending one point on the officer's police badge for each fatality—and treating

5  them to "beer and a barbecue" for their killing.  (SAC ¶¶ 48, 49.)  Part of gang members' reward

6  was also to be promoted within the VPD and protected from internal affairs investigations and

7  discipline.  (SAC ¶ 49.)  The SAC specifically alleges that two of the defendant officers—now-

8  Lieutenant Darden and former officer McMahon—have at least two badge bends.  (SAC ¶¶ 50-

9  52.)  Plaintiffs also allege that McMahon had engraved a "vigilante motto" on the back of his gun

10  (Veritas Aequitas), inspired by the movie The Boondock Saints—and that McMahon used that

11  gun to shoot McCoy.  (SAC ¶¶ 53-54.)

12     When Captain Whitney learned of McMahon's bent badge, he ordered all supervisors to

13  have their officers submit any bent badges—and at least ten other VPD officers submitted bent

14  badges.  (SAC ¶¶ 55-56.)  Chief Bidou allegedly ordered this evidence be "destroyed" and that

15  the officers personally repair their badges so there would be no "paper trail."  (SAC ¶¶ 60-61.)

16  Plaintiffs even allege that Chief Bidou was part of the gang—or at least met and conspired with

17  the gang in order to promote, maintain, and conceal the group's existence.  (SAC ¶¶ 57, 63.)

18     Plaintiffs allege that, as the VPD's final decision-maker, the Chief's "failure to discipline

19  [the defendant officers] demonstrates the existence of an entrenched culture, policy or practice of

20  promoting, tolerating and/or ratifying with deliberate indifference, the use of excessive force and

21  the fabrication of official reports to cover up the [defendant officers'] misconduct."  (SAC ¶¶ 64,

22  66.)  The SAC also repeats the prior complaints' broader allegations that, based on the numerous

23  prior excessive force incidents, the VPD has a pattern and practice of using excessive force

24  against citizens and failing to discipline or retrain the officers involved.  (SAC ¶ 67.)  Thus, the

25  SAC alleges, the City and the Chief's knowledge of—or negligence as to—this policy of

26  inadequate supervision and training constituted ratification of the unlawful behavior and

27  proximately caused the violation of plaintiffs' constitutional rights in this case.  (SAC ¶¶ 80-89.)

28  ////

4

**B.  The Giordano Investigation & Present Discovery Dispute**

In August 2020, after media reports of badge bending within the VPD, the City retained as independent contractors Robert Giordano, a retired former Solano County Sheriff, and attorney Christine Maloney "to investigate allegations Vallejo officers bent the points on their badges to mark fatal shootings."  (ECF No. 144, Joint Statement (JS) at 9.)  The present discovery dispute is about whether plaintiffs should obtain virtually all of the contents of Mr. Giordano's badge-bending investigation.

In December 2020, with the Giordano investigation barely begun, plaintiffs served Requests for Production of Documents ("RPD"), Set Three, requesting documents related to Whitney's termination, any and all investigations of badge bending in the VPD, and communications regarding the same.  (ECF No. 144.1, Buelna Decl. Ex. 1.)  In February 2021, while interviews were still underway, plaintiffs served RPD, Set Five, requesting (as relevant) documents related to McMahon's firearm engraving, a "Badge of Honor" group in the VPD, and investigations into the destruction of evidence by Chief Bidou or any other VPD employee.  (ECF No. 144.2, Buelna Decl. Ex. 2.)

In January and March 2021, defendants served responses to the respective RPDs asserting broad objections and privileges and stating that no responsive documents would be produced before the conclusion of the City's investigation.  (ECF Nos. 144.3 & 144.4.)  On April 27, 2021, defendants served a declaration from Mr. Giordano dated March 4, 2021 regarding his "ongoing internal affairs investigation."  (JS at 5; see ECF No. 144.11 at 29-31.)  Meanwhile, on April 21, 2021, plaintiffs' counsel had sent a meet-and-confer letter pointing out that defendants had not produced a privilege log or properly asserted their privileges—so waived them.  (JS at 5.)

Some four months later, on September 10, 2021, defendants amended their RPD responses and produced a privilege log describing 22 items from the Giordano investigation being withheld on the basis of the official information privilege and privacy privilege, along with relevance and proportionality objections.  (Id.; see ECF Nos. 144.5 (fully redacted privilege log), 144.14 (Abaci Decl.) at 35-59.)  With the amended responses and privilege log, defendants produced—subject to the parties' stipulated protective order (ECF No. 21)—audio recordings and transcripts of a select

1  number of officer interviews conducted by Giordano, and a <u>Kelly</u> affidavit from VPD Deputy

2  Chief Michael Kihmm, dated September 10, 2021, in support of the City's asserted official

3  information privilege.  (ECF No. 144.11, Kihmm Aff.)  Defendants explain in the Joint Statement

4  that their production choices were informed in part by Magistrate Judge Newman's order on a

5  similar motion to compel in another excessive force case against the City of Vallejo.  (JS at 11.)

6  <u>See</u> <u>Burrell v. City of Vallejo</u>, No. 2:19-CV-1898-WBS-KJN, 2021 WL 2661807, at *7-9 (E.D.

7  Cal. June 29, 2021) (ordering production of Giordano's interview of the defendant officer, but not

8  full production of all documents related to badge bending).

9       After unsuccessful meet and confer efforts, plaintiffs brought this motion to compel Items

10  #1, 5-8 and 10-23 of the privilege log.  (JS at 8; ECF No. 128.)  These comprise the Giordano

11  Report itself and Report Exhibits 4-22, which include—among various other items—all audio

12  recordings and transcripts of the numerous interviews Giordano conducted for the VPD.  Not

13  separately listed on the privilege log is a Supplemental Report prepared by Giordano after the

14  privilege log was produced.  Plaintiffs' motion embraces this Supplemental Report as well.

15  Finally, plaintiffs' counsel also request attorneys' fees and costs under Rule 37 for bringing this

16  motion.  (JS at 26.)

17  **DISCUSSION**

18       **A. Legal Standard**

19       The scope of discovery under Federal Rule of Civil Procedure 26(b)(1) is broad.

20  Discovery may be obtained as to "any nonprivileged matter that is relevant to any party's claim or

21  defense and proportional to the needs of the case."[3]  Fed. R. Civ. P. 26(b)(1).  "The relevance

22  standard is extremely broad, especially in civil rights excessive force cases."  <u>James v. Hayward</u>

23  <u>Police Dep't</u>, 2017 WL 2437346, * 1 (N.D. Cal. Feb. 27, 2017) (citing <u>Soto v. City of Concord</u>,

24  162 F.R.D. 603, 610 (N.D. Cal. 1995)).  "Relevancy alone is no longer sufficient to obtain

25  discovery, the discovery requested must also be proportional to the needs of the case."  <u>Centeno</u>

26

---

27  [3]     Evidence is relevant if it has "any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than it would be

28  without the evidence."  Fed. R. Evid. 401.

v. City of Fresno, No. 1:16–CV–653 DAD SAB, 2016 WL 7491634, at *4 (E.D. Cal. Dec. 29, 2016). The court may limit discovery if it is "unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive"; or if the party who seeks discovery "has had ample opportunity to obtain the information by discovery"; or if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

"The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirements of Rule 26(b)(1)." Bryant v. Ochoa, 2009 WL 1390794 at *1 (S.D. Cal. May 14, 2009) (citations omitted). "Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections." Id.

**B. Analysis**

The court addresses the relevance and proportionality of the requested discovery, and then turns to the asserted privileges.

*1. Relevance*

a. The Report

The centerpiece of plaintiffs' motion to compel is the Giordano Report and the Supplemental Report, both of which the court has reviewed in camera without the accompanying exhibits (collectively, "the Report" or "the Giordano Report"). Without divulging the specific contents (as the Report shall remain subject to the parties' stipulated protective order), the Report is part of an administrative investigation into badge-bending allegations that almost perfectly mirror those leveled in the SAC. The Report extensively summarizes Mr. Giordano's investigative methods, interviews conducted, overall findings, and specific recommendations for discipline.

The Report labels those interviewed as "witnesses" if "they were not suspected of having committed any violation of any Department policy, rule or law"; and it labels interviewees as "subjects" if they were "considered to have potentially violated policy, a rule or a law, which could result in disciplinary action against them." (Kihmm Aff. ¶ 15.) In addition to detailed

interview summaries, the Report makes factual findings and "reaches conclusions on misconduct" both regarding badge bending in the Department overall and as to specific policy violations by current and former VPD personnel.  (Id.)  The Report concludes with "sustained" findings as to "some, but not all," subjects—and "exonerate[s]" other subjects.  (Id.)  At the hearing on the motion to compel, defense counsel confirmed that, while the Giordano Report "is finalized," the current VPD Chief has not yet decided on any disciplinary action based on the Report's recommendations.

There is no doubt that this Report, encapsulating Mr. Giordano's investigation of nothing but badge bending in the VPD, contains information relevant to plaintiffs' claims of excessive force, Monell claims, and supervisory claims.  The level to which bending badges pervaded the Department such that Bidou and the City cannot claim reasonable ignorance of it, or Bidou's actual knowledge of the badge bending is key to proving the Monell claim.[4]  And evidence that any particular individual defendant engaged in badge bending—or was inspired by a culture of badge bending or lackluster discipline in the VPD—would go toward proving their motivation for shooting McCoy without warning and in the reckless manner alleged.

b.  The Interviews

In the course of his investigation, Mr. Giordano conducted numerous interviews, all of which were audio-recorded and transcribed—and included as exhibits to the Report.  Defendants have already produced to plaintiffs the interviews of "every officer involved in the McCoy shooting."[5]  (JS at 27.)  However, these are but a fraction of the existing interview recordings and transcripts.

As discussed below, the undersigned currently does not find it proportional to the needs of the case to compel production of every interview conducted in the Giordano investigation.

---

[4]     Having reviewed the entirety of the Report, the court notes that Mr. Giordano's findings do not necessarily confirm plaintiffs' theory of the reasons for, or meaning of, officers bending their badge.  However, that does not mean the Report—whose summaries and findings are open to multiple reasonable interpretations—is not relevant, for purposes of discovery.

[5]     Two of the audio recordings were filed with the court under seal for this discovery dispute.  (ECF Nos. 144.7, 144.8.)

However, to guide the parties in their anticipated continuing negotiations regarding interview production, the court offers the following observations on interview relevance.

Defendants argue that, having already received the interviews of every officer involved in the McCoy shooting, plaintiffs already know whether the defendant officers were or were not involved in badge bending and whether it motivated their use of deadly force.  (JS at 27.)  Without any additional analysis, defendants further claim that "[w]hether any other of the . . . officers subject to the investigation bent a badge[] is irrelevant to the claims against the City and the officers defendant here."  (Id.)

The court disagrees on both fronts.  First, plaintiffs should not have to rely solely on any defendant's own self-interested statements to Mr. Giordano to establish whether or not the officer defendants bent their own badges or had any connection to badge bending within the VPD.  Obtaining at least those interviews of others who mentioned the defendant officers in connection with badge bending would also be helpful, if not necessary, to establishing plaintiffs' claims.  Second, although it may not be relevant which (if any) non-defendant officers were involved in badge bending, the overall number of officers with bent badges—or with knowledge of badge bending—is relevant to show how prevalent the practice was at the VPD before and during Chief Bidou's tenure.  Knowing the names of the officers with bent badges or knowledge of badge bending might also be required in order to figure out whether any of them were also involved in excessive force incidents for which they were not timely disciplined.  In contrast to the Burrell case where allegations of badge bending never came into the pleadings, see 2021 WL 2661807, at *2-3, here, plaintiffs' Monell claims rely significantly (though not exclusively) on express and detailed allegations of badge bending within the VPD.

Defendants also argue that four specific interviews are not relevant to plaintiffs' claims.  First, defendants argue that the interviews of the supervisory defendants Darden and Wylie are not relevant because their liability does not arise from badge bending.  (JS at 28.)  The only remaining cause of action against Darden and Wylie in the SAC is the Eighth Cause of Action for supervisory liability, which arises from their failure to respond to the pre-shooting radio dispatch.  (SAC at 34-35.)  Further, according to defendants, Darden and Wylie are not alleged to be final

1   decision-makers for the City, so their knowledge would not go toward proving the <u>Monell</u> claim.

2   However, in the court's view, Darden and Wylie's interviews are at least as relevant as every

3   other officer's to the extent they might show knowledge of any general Department-wide

4   awareness of the practice.  And as supervisors in the Department, they (more so than a patrol

5   officer) might have particular familiarity with former Chief Bidou's knowledge of the practice.

6        Second, defendants specifically challenge the relevance of Mr. Giordano's interviews with

7   two high-level Vallejo city officials, arguing that Chief Bidou alone was the final decision-maker

8   for the VPD.  (JS at 27.)  Even accepting this legal proposition (as plaintiffs appear to, having

9   dropped their <u>Monell</u> claim against City Manager Nyhoff early in the litigation, <u>see</u> ECF No. 12

10  at 12), the undersigned sees continuing relevance in the interviews with other high-level city

11  officials.  These officials presumably interacted with Chief Bidou at least intermittently as part of

12  their duties and likely have some knowledge of Chief Bidou's level of awareness about, and

13  response to, any badge bending.  That these officials do not control VPD policy does not make

14  them unknowledgeable about VPD practices, or Chief Bidou's decision-making.

15       Once plaintiffs have reviewed the redacted version of the Giordano Report themselves,

16  they will presumably be able to tailor their relevance arguments in requesting production of these

17  or other specific interviews from defendants.[6]

18                    c.   The Other Exhibits

19       Finally, plaintiffs are seeking to compel production of some 17 other exhibits to the

20  Giordano Report—besides the interview transcripts and audio recordings.  Neither party devotes

21  much argument in the Joint Statement to the specific exhibits, which the undersigned also views

22  as more ancillary to the Report.  With only the somewhat generic descriptions of the exhibits

23  listed in the privilege log, the undersigned can offer little guidance on which may or may not be

24  relevant to plaintiffs' claims.  Most, if not all, of the exhibits are specifically described or

25  reproduced within the Report itself, however.  Accordingly, the court leaves it to the parties to

26  _____

27  [6]     By addressing these four interviews, the court does not suggest that they are more or less
    important to plaintiffs' claims than any others.  The court is simply addressing the only specific
    relevance arguments asserted by defendants, in hopes of informing the parties' discovery
28  negotiations going forward.

1  discuss the relevance and need to produce any individual exhibits to the Report, after plaintiffs

2  have reviewed the contents of the Report.

3    *2.  Proportionality*

4    Defendants' main opposition to plaintiffs' motion is that broader production is not

5  proportional to the needs of the case.  Defendants argue that further production of any materials

6  prepared as part of the Giordano investigation is not proportional, given all they have already

7  produced to plaintiffs, citing delivery of more than 9,000 pages of documents.  (JS at 8-9.)

8    Rule 26 requires that discovery be proportional to the needs of the case, including

9  balancing "the importance of the discovery in resolving the issues, and whether the burden or

10  expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  The

11  proportionality inquiry can also account for the "burden of production on the privacy rights of

12  non-parties."  Rodriguez Ayala v. Cty. of Riverside, 2017 WL 2974919, at *4 (C.D. Cal. July 12,

13  2017).

14    a.  Proportionality of the Report

15    The undersigned sees very little reason to view production of the Giordano Report itself as

16  disproportional or unduly burdensome in this case.  The Report already exists as a standalone

17  document, so no culling of scattered records is required.  And based on defendants' proposed

18  redactions reviewed in camera, the privacy rights of non-parties can easily be protected through

19  limited redaction.  Furthermore, production of the Report strikes the court as an ideal starting

20  point for resolving the present dispute because Mr. Giordano has already done the work of

21  summarizing the interviews conducted and—presumably—omitting any private details not

22  relevant to badge-bending allegations.

23    b.  Proportionality of the Interviews

24    On the other hand, it would be disproportional and unduly burdensome to compel

25  production of the audio recordings and transcripts of all of Giordano's interviews at this point.

26  There are a large number of interviews, and it would be a heavy burden to require defendants to

27  review the voluminous transcripts to redact any personal or medical details that the interviewees

28  might have shared—information which plaintiffs acknowledge having no interest in.

11

At the same time, some further production of interviews beyond those officers "involved in the McCoy shooting" (JS at 27) does appear warranted, based on the nature of plaintiffs' allegations and the undersigned's review of the Report's interview summaries.  Defendants' reliance on Judge Newman's order in Burrell to inform their decision to limit their production thus far to the shooting-involved officer-defendants is not entirely justified because this case differs from Burrell in two material respects.  First, the underlying incident in Burrell was not a fatal shooting, making it more difficult to connect the defendant officer's actions toward Mr. Burrell to a group that allegedly rewards killings specifically.  Judge Newman's decision to order production of the officer's interview with Mr. Giordano, nonetheless, was based on the allegation that the officer pulled his gun on another civilian without obvious cause, see Burrell, 2021 WL 2661807, at *6, creating a potential, distant connection.  Here, the connection between officers firing without warning on a sleeping person, on the one hand, and their awareness of or membership in a gang that allegedly rewards killing, on the other, is easily drawn.

Second, the Burrell case's Monell claims are not based on any badge-bending allegations, despite the plaintiff's efforts to add them in after discovery was well underway.  See id. at *2-3.  The absence of such allegations likely factored heavily in Judge Newman's decision to compel only limited production of the defendant-officer's own interview with Mr. Giordano.  See id. at *6 (finding plaintiff "entitled to some discovery related to badge bending—even without specific allegations regarding that practice in the operative complaint—but that full production of all communications regarding badge bending is not presently warranted").  As described above, the SAC in this case is full of detailed allegations of badge bending, both as to the shooting-involved officer-defendants' personal motivation for shooting McCoy—and to show Chief Bidou's knowledge of badge bending and ratification of the practice either actively or passively.  Simply put, this case has much more to do with badge bending than does Burrell.

At the hearing, neither side could suggest a bright-line approach to narrowing down which interviews might warrant production.  However, the undersigned trusts that once the Giordano Report is (essentially) equally available to both parties, they will be able to compromise as to an initial set of interviews to be produced—and potentially continue any further production on a

1    rolling basis, depending on what the initial interviews reveal.

2               *3.  Privileges*

3         The bulk of the discovery disagreement, as originally presented, was whether defendants'

4    privilege objections noted in the privilege log should prevent production of the requested

5    materials in toto.  Specifically, plaintiffs argued that (a) defendants waived any claims of

6    privilege by not timely and specifically asserting them in response to plaintiffs' RPDs Three and

7    Five, (b) that defendants failed to adequately invoke the official information privilege through

8    Dep. Chief Kihmm's affidavit, and (c) that in any event plaintiffs' need for disclosure outweighs

9    the competing privacy and governmental interests in confidentiality.  (JS at 19-26.)

10        The court first dispenses with the waiver and inadequate invocation arguments, finding at

11   least the privileges actually asserted in the privilege log (the official information privilege and the

12   privacy rights of individual officers) timely asserted, and having already reviewed the Report in

13   camera.  Then, given that defendants now propose only one set of redactions under the official

14   information privilege, the court conducts the official information balancing test with respect to

15   that specific information—before addressing defendants' purely privacy-based redactions, and

16   other remaining proposed redactions based on newly asserted privileges.

17               a.      Waiver & Invoking the Official Information Privilege

18        Given the circumstances and timeline of the creation of the materials responsive to

19   plaintiffs' RPDs, the court declines to find waiver of any privilege objections for not being

20   asserted within 30 days of the production requests.  See Burlington N. & Santa Fe Ry. Co. v.

21   U.S., 408 F.3d 1142, 1149 (9th Cir. 2005) (rejecting per se waiver of privileges if privilege log

22   not produced within Rule 34(b)'s 30-day limit, and listing factors for district court to apply

23   holistic case-by-case waiver determination).  It is unclear at best whether any responsive

24   documents existed prior to Mr. Giordano's investigation, which was ongoing when plaintiffs

25   served the RPDs and for many months thereafter.  Considering the magnitude of the requests, the

26   impossibility of disclosing not-yet-created documents, and the reasonable desire to wait until the

27   Report was finalized before assessing privileges all at once, there was no waiver here.

28        Next, the court already impliedly found the affidavit of VPD Deputy Chief Michael

1    Kihmm sufficient to warrant in camera review of the Giordano Report, making it unnecessary to

2    belabor whether the affidavit sufficiently invoked the official information privilege with respect

3    to the Report.  See Soto v. City of Concord, 162 F.R.D. 603, 613 (N.D. Cal. 1995) (if party

4    raising official information privilege submits sufficient Kelly affidavit, then court will order in

5    camera review and balance each party's interests); Kelly v. City of San Jose, 114 F.R.D. 653, 671

6    (N.D. Cal. 1987).  Accordingly, the court proceeds to the necessary balancing of interests.

7                          b.      Proposed Redactions Based on the Official Information Privilege

8            Although defendants withheld the entire Giordano Report from plaintiffs based on the

9    official information privilege, in response to the court's order to submit the Report with proposed

10   redactions for in camera inspection (ECF No. 141), defendants now assert the official information

11   privilege to redact only select passages of the Report—all pertaining to one officer-defendant in

12   this action.[7]  Defendants proposed no redactions at all to the Supplemental Report.

13           "Federal common law recognizes a qualified privilege for official information."  Soto, 162

14   F.R.D. at 613 (citing Kerr v. U.S. Dist. Ct. for N. Dist. of Cal., 511 F.2d 192, 198 (9th Cir.

15   1975)).  "In determining what level of protection should be afforded by this privilege, courts

16   conduct a case by case balancing analysis, in which the interests of the party seeking discovery

17   are weighed against the interests of the governmental entity asserting the privilege."  Id.  "In the

18   context of civil rights suits against police departments, this balancing approach should be

19   'moderately pre-weighted in favor of disclosure.'"  Id. (quoting Kelly, 114 F.R.D. at 661)).

20           Defendants' Kelly affidavit by Deputy Chief Kihmm identifies two governmental interests

21   at stake: (1) the Department's interest in imposing effective discipline on any officers found unfit

22   to serve based on the Giordano Report's findings, and (2) the privacy rights of non-defendant

23

24   _____

     [7]      The court declines to assess at this juncture whether the official information privilege
25   might properly protect disclosure of portions of any interviews.  The privilege likely would not
     apply to prevent disclosure of an entire interview, but the court's discussion of the official
26   information redactions proposed in the Report should not be taken as a wholesale rebuke of the
     privilege's assertion in other contexts.  Defendants would be wise, however, to tailor their
27   assertions of the privilege in line with the reasoning expressed in this order.  The court will take
     up any disagreements the parties cannot resolve themselves regarding redaction of specific
28   portions of interviews, as necessary.

                                          14

1   police officers in maintaining confidentiality as to medical and personnel matters and personal

2   information not relevant to this lawsuit.  (Kihmm Aff. ¶¶ 20-22.)  The latter interest (in

3   preserving the privacy of non-defendant officers interviewed) does not apply to the "official

4   information" redactions now proposed to the Report because the only such proposed redactions

5   are for passages regarding one of the named defendants in this case.

6         Defendants propose redacting from the Report all conclusions regarding misconduct by

7   this defendant—both Mr. Giordano's narrative summary of the misconduct found and his

8   "sustained" findings as to particular policy violations by this defendant.  The court finds that

9   plaintiffs' need for this information surpasses defendants' asserted disciplinary interest in

10  preventing disclosure to plaintiffs.

11        Defendants (through Kihmm) argue that disclosing Mr. Giordano's findings of a particular

12  officer's "sustained" policy violations—which might lead to formal discipline—raises due

13  process concerns under the United States and California Constitutions because those findings

14  might then be revealed to the officer himself, or to others, over the course of discovery (even if

15  used confidentially, under the parties' protective order) before the officer receives the

16  constitutionally required notice of intent to discipline.  (Kihmm Aff. ¶¶ 20, 25, 26.)

17        The court does not give much weight to defendants' concern that disclosure of

18  Mr. Giordano's findings to plaintiffs (subject to the protective order) will jeopardize any

19  forthcoming discipline by inviting due process challenges.  The court recognizes peace officers'

20  constitutionally guaranteed procedural rights in the disciplinary context, including their rights to

21  adequate notice of contemplated discipline and an opportunity to respond to the underlying

22  complaint before any discipline is imposed.  However, even when pressed further on the subject

23  at the hearing on the motion to compel, defendants have not been able to explain why it might

24  offend due process for an officer—or one if his colleagues—to find out through this litigation that

25  he might later be notified of an intent to discipline based on Mr. Giordano's findings.  As

26  defendants themselves emphasize, no disciplinary decisions based on the Giordano Report have

27  yet been reached, so any officer discovering for the first time that he was (for instance) identified

28  as a "subject" in the Report and assigned "sustained" violations of VPD policy would essentially

15

1    just be learning what he likely already knows—that he *may* face formal discipline for his conduct

2    revealed through the investigation.  Should the VPD someday decide to discipline any of the

3    officers for whom Mr. Giordano found "sustained" policy violations, they would presumably first

4    be issued the constitutionally required pre-disciplinary notice of intent to discipline and would

5    still be able to respond to the complaint before any discipline is imposed.  Receiving "extra

6    notice" of the grounds for potential future discipline does not violate an officer's due process

7    rights.

8              Defendants' due process liability argument rings all the more hollow when viewed against

9    the proposed redactions ultimately provided.  Defendants propose redacting only the narrative

10   summary and "sustained" policy violations for one VPD officer—one of the defendants in this

11   case—without proposing any similar redactions for other current VPD personnel who

12   Mr. Giordano also concluded had violated Department policy.  The interest in preventing

13   premature disclosure of possible forthcoming discipline should apply equally for all similarly

14   situated personnel, were it to apply at all.

15             On the other side of the scale, plaintiffs' interest in obtaining conclusions as to misconduct

16   related to badge bending *by one of the defendants named in this action* is quite high.

17   Accordingly, the Giordano Report will be ordered produced to plaintiffs—subject to the existing

18   protective order—**without any of the redactions proposed under the official information**

19   **privilege**.  The court orders production subject to the parties' protective order in recognition of

20   the VPD's interest in maintaining some degree of confidentiality in the Report, both to minimize

21   the broadcasting of disciplinary recommendations that are still hypothetical at this point and to

22   preserve the Department's ability to conduct reliable internal investigations which depend on

23   officers participating in a candid and forthcoming manner.[8]

24   _____

25   [8]     The court rejects defendants' suggestion that the protective order cannot adequately serve
     these interests because plaintiffs' counsel in a previous case with the City violated the stipulated

26   protective order in place there.  See I.F. v. City of Vallejo, No. 2:18-CV-0673-JAM-CKD, 2021
     WL 601054 (E.D. Cal. Feb. 16, 2021).  The undersigned presided over that discovery dispute and

27   is intimately acquainted with the full circumstances of the violation, which was found to be
     accidental.  See id. at *15 (finding that counsel "believed he was simply passing along to the

28   media information that was already publicly available," and that the firm was "unlikely to repeat

                                              16

1

c.      Proposed Redactions Based on Privacy

2      Nearly all of the other redactions proposed in the Report are based purely on the privacy

3 interests of VPD employees who are not defendants in this case.

4      "Resolution of a privacy objection or request for a protective order requires a balancing of

5 the need for the information sought against the privacy right asserted." Soto, 162 F.R.D. at 616.

6 "In the context of the disclosure of police files, courts have recognized that privacy rights are not

7 inconsequential." Id. (citing Kelly, 114 F.R.D. at 660).  "However, these privacy interests must

8 be balanced against the great weight afforded to federal law in civil rights cases against police

9 departments." Id.  Further, a carefully drafted protective order can "minimize the impact" of

10 disclosure.  Id.

11      Defendants propose redacting from the Report three categories of information based on

12 privacy concerns.  The court finds that the interest in redacting two of the three types of

13 information outweighs plaintiffs' need for the information sought.

14      The first category of privacy-based redactions is to omit medical information and personal

15 relationship details mentioned about numerous officers throughout the Report.  Although this

16 information is scattered across the Report, defendants' proposed redactions are appropriately

17 limited to the bare minimum needed to prevent the needless disclosure of very personal

18 information that would not be relevant to plaintiffs' claims in any event.  The court approves

19 these redactions.

20      Second, defendants propose redacting on privacy grounds two photographs of a sample

21 badge that Mr. Giordano used in his investigation to understand what a "bent badge" actually

22 looked like.  The photographs depict a VPD badge with a badge number visible in the center.

23 Defendants labeled these proposed redactions as "Privacy. Unknown if badge number is

24 associated with any current or former officer."

25      The court agrees that plaintiffs have no need to see the badge number depicted on the

26 sample badges shown in these two photographs.  The Report makes clear that the badge was not

27

28 their mistake").  The court maintains that belief and declines the invitation to hold plaintiffs'
counsel's admitted mistake against their clients in subsequent cases.

bent when Mr. Giordano obtained it—rather, he bent it himself, for the reader's reference—and the photos are included in the Report only to demonstrate Mr. Giordano's understanding of what a bent badge actually looked like.  However, plaintiffs have a strong interest in viewing these photographs in order to understand the Report, themselves.  Thus, the court strikes a middle ground.  **The photographs of the sample badge shall not be redacted, except that the badge number shall be blurred or otherwise obstructed**.

Third and finally, defendants propose redacting from the Report all named references to four VPD officers who were identified as "subjects" of investigation but were ultimately found to have done nothing wrong.  Defendants propose redacting these officers' names along with all information that would allow one to deduce the officers' identities from the context of the Report.  The court finds that these officers' privacy interests outweigh plaintiffs' need for the information being redacted.  For the most part, defendants propose simply omitting these four officers' names wherever they appear in the Report.  The court finds it appropriate to protect these officers' identities; however, instead of flatly redacting the officers' names, **defendants shall replace each of the four officers' names with a generic identifier, such as Witness A, B, C, and D, to be consistently used for that officer throughout the Report**.  This substitute identifier will allow plaintiffs to follow the contents of the Report and perhaps make connections involving these four officers—without discovering their actual names.

In three instances, defendants propose redacting entire sections of the Report relating to three of these four officers.  These redactions are overinclusive, given the limited goal of protecting each officer's identity.  **The block redactions on pages 151, 162, and 163 of the Report shall be removed; and instead, defendants shall simply replace the name of the protected officer with their designated generic identifier—leaving the surrounding text visible**.

d.    <u>Other Proposed Redactions</u>

The last set of redactions to be addressed are proposed based on entirely different grounds of attorney-client and deliberative-process privilege.  Initially, these proposed redactions go beyond the scope of the court's invitation for defendants to propose redactions "on the basis of

18

1   privacy or official information privilege as asserted in the privilege log." (ECF No. 141.)

2   Nevertheless, these proposed redactions are not entirely unexpected as defendants argued in the

3   Joint Statement that the City only recently learned—after producing the privilege log—that

4   "some interviews disclosed communications protected by attorney-client and deliberative-process

5   privileges." (JS at 9.)  In support of the proposed redactions to the Report, defendants refer (as

6   they did in the Joint Statement) to the declaration of Chief Assistant City Attorney Randy

7   Risner.[9]  (ECF No. 144.13.)  Because defendants only raised these privileges in the Joint

8   Statement, it is unclear whether and to what extent plaintiffs oppose the assertion of these

9   privileges which were not indicated in the September 2021 privilege log.

10          Without revealing the specific contents of the Report, the first passage defendants propose

11  redacting on attorney-client and deliberative-process grounds describes the interviewee's own

12  recollections and feelings regarding oversight of the VPD around the time of the McCoy

13  shooting.  The second passage describes a different interviewee's statements of what they

14  observed in watching body-camera footage of the McCoy shooting.  Looking at the text of

15  Mr. Giordano's summaries of these interviews, the court cannot readily find grounds for redaction

16  under either the attorney-client or deliberative-process privileges.[10]  Neither of the two passages

17  overtly describe communications with an attorney or governmental deliberations beyond the

---

18  [9]      In an abundance of caution, the court permitted the Risner Declaration to be filed with

19  certain paragraphs redacted, so the court does not describe the full contents of the declaration in
    this order.

20

21  [10]     The deliberative-process privilege "permits the government to withhold documents that
    reflect advisory opinions, recommendations and deliberations comprising a part of a process by

22  which government decisions and policies are formulated."  Federal Trade Comm'n v. Warner
    Commc'ns, Inc., 742 F.2d 1156, 1161 (9th Cir. 1984). The ultimate purpose of the privilege is to

23  protect the quality of agency decisions by promoting frank and independent discussion among
    those responsible for governmental decision-making.  Id.

24

25          "The attorney-client privilege protects confidential disclosures made by a client to an
    attorney in order to obtain legal advice, as well as an attorney's advice in response to such

26  disclosures."  U.S. v. Ruehle, 583 F.3d 600, 607 (9th Cir. 2009) (cleaned up).  Notably, "[t]he
    privilege only protects disclosure of communications; it does not protect disclosure of the

27  underlying facts by those who communicated with the attorney."  Upjohn Co. v. United States,
    449 U.S. 383, 395 (1981); see id. at 395-96 ("A fact is one thing and a communication concerning

28  that fact is an entirely different thing." (cleaned up)).

1  interviewee's own personal thought process.  It may well be that the underlying interviews

2  themselves contain privileged information protectable on these grounds (based on information not

3  reflected in the Report); however, the court cannot find the identified portions of the interview

4  *summaries* to be privileged.  **The redactions proposed on pages 18-19 and on pages 20-21**

5  **shall be removed.**

6  **CONCLUSION**

7        For these reasons, defendants shall forthwith produce to plaintiffs—subject to the existing

8  protective order—the Giordano Report and Supplemental Report with all proposed redactions

9  except those specifically rejected or modified herein (as bolded above).  Defendants shall label

10  the basis for each redaction in the margins.  The parties shall thereafter meet and confer in good

11  faith to negotiate which interviews and/or other exhibits to the Report shall be produced as well.

12  The court anticipates that any interviews produced would warrant redaction of information

13  similar to the redacted information the court has approved in this order.

14        Should plaintiffs wish to pursue an award of attorneys' fees for bringing the instant

15  motion, they may file a supplemental fees request along with billing records to substantiate the

16  request.[11]  The court is inclined, however, to have each side bear its own costs and expenses for

17  this motion, given the mixed result for plaintiffs and the additional efforts already required of

18  defendants in providing the court with proposed redactions of voluminous materials.  See Fed. R.

19  Civ. P. 37(a)(5)(C) ("If the motion [to compel discovery] is granted in part and denied in part, the

20  court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the

21  motion."); Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ., 2017 WL

22  3116818, at *5 (E.D. Cal. July 21, 2017) (Rule 37(a)(5)(C) "confers substantial discretion on a

23  court to determine how to apportion expenses").

24  ////

25  ////

26

27  [11]     Such a request should be limited to time expended on the motion to compel, itself, not the
supplemental briefing regarding the separate (albeit related) request to seal.  Defendants would

28  then receive an opportunity to oppose the fees requested.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiffs' motion to compel (ECF No. 128) is GRANTED IN PART and DENIED IN PART, without prejudice to renewal;

2. Defendants shall forthwith produce to plaintiffs—subject to the existing protective order—the Giordano Report and Supplemental Report with all proposed redactions except those specifically rejected or modified herein (as bolded above), labeling the basis for each redaction in the margins;

3. The motion is denied without prejudice as to the accompanying interviews and other exhibits to the reports.

Dated:  December 28, 2021

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

19.mcco.1191

21